UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

JENNA MARIE DUNCAN, individually and on
behalf of all others similarly situated,

                       Plaintiff,

        -against-

KAHALA FRANCHISING, L.L.C.,

                Defendant.

----------------------------------------------------------------X

**FILED**
**CLERK**

2:18 pm, May 02, 2024

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM OF**
**DECISION AND ORDER**
CV 22-7841 (GRB)(AYS)

**GARY R. BROWN, United States District Judge:**

> *"They say all my flavors are guaranteed to satisfy."*
> -Van Halen, "Ice Cream Man"

       Archeological evidence suggests that humans have been snacking on pistachios since the Bronze Age.[1]  And though viscerally associated with modern refrigeration techniques, ice cream—as we understand it—was likely crafted by Europeans in the 1600s[2] and also has ancient forebears enjoyed by King Solomon, Alexander the Great and Emperor Nero.[3]

       This delightful dispute lies at the crossroad between these celebrated treats.  It raises a deceptively complex question about the reasonable expectations of plaintiff and like-minded ice cream aficionados: should consumers ordering pistachio ice cream at one of defendant's establishments expect that that product will contain actual pistachios?  And if the answer is no, should that leave them with a bitter aftertaste?

---

[1] D. T. Potts, A Companion to the Archaeology of the Ancient Near East, Volume One 199 (2012).
[2] Nate Barksdale, *Who Invented Ice Cream?*, History.com, Apr. 17, 2023, https://www.history.com/news/where-do-ice-cream-sorbet-frozen-desserts-come-from#.
[3] James Hardy, *Who Invented Ice Cream? A Delicious History*, History Cooperative, Mar. 11, 2024, https://historycooperative.org/the-history-of-ice-cream/.

*Factual Background*

The facts alleged in the amended complaint, which are taken as true for the purposes of the pending motion, include the following:

**The Pistachio Problem**

> *"They say you're just vanilla with a tealish hue*
> *So cherry and sweet, yet nutty and green . . .*
> *When I read your name in the parlor*
> *There's no other flavor to choose."*
>                         -My Name is DC, "Pistachio Ice Cream"

On a hot summer day in July 2022, plaintiff Jenna Marie Duncan found herself at a Cold Stone Creamery in Levittown, one of nearly 1,000 such locations operated by defendant, an Arizona corporation.  Docket Entry ("DE") 21 ¶¶ 5-6.  There, she was confronted with this lovely array—a literal and figurative smorgasbord of confectionary choices:



Fig. 1.  Ice Cream Tubs, Including Pistachio



Fig. 2. Additional Ice Cream Tubs

Summoning significant restraint, plaintiff limited her order solely to the bin marked "Pistachio." Based on the use of the name, plaintiff claims that she "reasonably believed that the Pistachio ice cream she purchased from defendant contained pistachio."  *Id.* ¶ 5.

As is so often the case in stories, however, heartbreak followed: by later reviewing defendant's ingredients list on its website, plaintiff learned that the products "use a mixture of highly processed ingredients to mimic the flavor of the fruits, nuts, and other ingredients

2

specified in the Products' names," but alas, no pistachio.  *Id.* ¶ 17.  In its place, plaintiff contends that defendant deployed "PISTACHIO FLAVORING" consisting of "Water, Ethanol, Propylene Glycol, Natural & Artificial Flavor, Yellow 5, [and] Blue 1."  *Id.*  "Had she known that the Product did not contain pistachio," plaintiff concludes, "she would not have purchased it, or would have paid significantly less for it."[4]  *Id.* ¶ 5.

Having expressed her own dissatisfaction, plaintiff envelops fellow purchasers of defendant's "Pistachio" within her disenchantment, contending that "[w]hen consumers purchase pistachio ice cream, they expect pistachios, not a concoction of processed ingredients."  *Id.* ¶ 18. Plaintiff proffers evidence in support of this belief.  First, she examines industry practice, noting that Häagen-Dazs Pistachio Ice Cream and Ben and Jerry's Pistachio Ice Cream both include actual pistachios, as does Thrifty brand ice cream, disparagingly described as "a less premium brand than Cold Stone Creamery."  *Id.* ¶ 19.  Plaintiff even points an accusatory finger at defendant, observing that "its strawberry ice cream contains strawberry, banana ice cream contains banana, and its chocolate hazelnut ice cream contains chocolate and hazelnut."  *Id.* ¶ 20.

Plaintiff further supports her claims through a consumer survey conducted especially for the purposes of this litigation.  The survey obtained the opinion of more than 400 U.S. consumers, each of whom had purchased ice cream within the preceding three months.  *Id.* ¶ 22. With respect to the Pistachio ice cream, after being shown Figure 1, *supra*, each was asked "When viewing the image above, what ingredients do you believe would be included in the Pistachio ice cream? Select all that apply."  *Id.* ¶ 22.  Each was presented with a list of ten potential ingredients, including pistachio and flavor agents, as well as the option "none of the above."  *Id.*; DE 21-1 at 21-23.  The results showed that about 85% of the respondents believed

---

[4] The complaint contains something of a mystery: plaintiff offers no hint as to whether she consumed some or all of the ice cream, or whether she enjoyed it.  One can only hopefully presume that the answer to both inquiries is yes.

that pistachio would be included.  DE 21 ¶ 22; DE 21-1 at 22 .  Using a similar protocol, the survey suggested that 88.6% of respondents expected that the Mint ice cream contains "mint." DE 21 ¶ 22; DE 21-1 at 25.

### The Gelato Generalization

> *"Flip back the lid*
> *Scoop everything in sight*
> *Make it a rainbow of red, brown and white*
> *Chocolate chip and everything that's nice*
> *Tutti frutti once and spumoni twice."*
> – Louis Prima, "Banana Split for My Baby"

Having stated her case for pistachio pretention, plaintiff attempts to condemn a broader flavor fakery.  The amended complaint deprecates defendant's Mango, Coconut, Mint, Orange and Butter Pecan Ice Cream, as well as its Orange Sorbet, claiming that, like defendant's Pistachio Ice Cream, these "[p]roducts are merely *flavored* after their named ingredients."  DE 21 ¶¶ 11, 16-17.  "This is not what consumers expect," plaintiff insists.  *Id.* ¶ 21.  While plaintiff decries the absence of mango, coconut, mint and orange in these additional items, with respect to Butter Pecan Ice Cream, pecans are not the problem; the deficit is limited to an absence of butter.[5]  *Id*. ¶ 16.

With respect to these products, plaintiff offers far less support.  No mention is made of competitor products.  No survey evidence is offered as to these additional offenders with the sole exception of Mint Ice Cream, noted above.  And, importantly, perhaps driven by the axiom that begins "fool me once," there is no suggestion that plaintiff purchased any of the other accused ice creams, and apparently plaintiff had the willpower to resist the allure of the Orange Sorbet— or for that matter any of defendant's sorbets.

Based on these factual allegations, plaintiff, on behalf of herself and a putative class of

---

[5] Of course, the health implications of adding real butter to ice cream are enough to make a cardiologist faint.

ice cream eaters and their sorbet allies, purports to assert claims for relief for violations of New York General Business Law § 349 and § 350, breach of express and implied warranties and unjust enrichment.

### Procedural History

On December 23, 2022, amidst the winter holiday season (when, presumably, the summertime longing to purchase ice cream had waned), plaintiff filed a complaint.  DE 1.  In February 2023, defendant filed a pre-motion conference letter seeking to dismiss the complaint for failure to state a claim, to which plaintiff responded.  DE 15; 16.  Following oral argument at a pre-motion conference on July 25, 2023, the Court deemed the motion made and granted it, dismissing the complaint without prejudice and with leave to amend.  DE 20.  Plaintiff filed an amended complaint which, for the first time, included the survey evidence discussed above.  DE 21.  At a subsequent pre-motion conference, this Court set a schedule for full briefing of defendant's renewed Rule 12(b)(6) motion, which has since been filed.  DE 26.  This opinion follows.

### Standard of Review

The oft-repeated and well-understood standard of review for a motion to dismiss under Fed. R. Civ. P. 12(b)(6) has changed little from the first decade of this century when the Supreme Court issued its decisions in *Iqbal* and *Twombly*.[6]  In short, assuming the allegations of the complaint to be true and drawing inferences in favor of the plaintiff, the factual matter asserted must contain claims that are facially plausible.

Plaintiff asserts claims pursuant to New York General Business Law § 349 and §

---

[6] For those requiring a refresher, the undersigned recommends a recent thorough and nuanced reiteration of this standard by my learned colleague Judge Scarcella, whose discussion is incorporated by reference herein.  *See In re Molina*, 657 B.R. 172, 181 (Bankr. E.D.N.Y. 2023)

350, about which this Court has previously observed:

> Section 349 of the New York General Business Law ("GBL") prohibits "deceptive acts and practices in the conduct of any business, trade or commerce or in furnishing of any service." N.Y. Gen. Bus. Law § 349. A deceptive act or practice is one that is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000). Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. Law § 350. False advertising means "advertising, including labeling . . . if such advertising is misleading in a material respect." *Id.* § 350-a(1). Both provisions permit "any person who has been injured by reason of any violation" thereof to bring an action to recover damages or to enjoin the deceptive act or practice, or both. *Id.* §§ 349(h), 350-e(3).
>
> "The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to § 349." *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 n.1 (2002); *see also Gristede's Foods Inc. v. Unkechauge Nation*, 532 F. Supp. 2d 439, 451 (E.D.N.Y. 2007) (the standards under Sections 349 and 350 are "substantively identical"). To state a claim under either section, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (2009)).

*Scholder v. Sioux Honey Ass'n Coop.*, No. CV 16-5369 (GRB), 2022 WL 125742, at *2

(E.D.N.Y. Jan. 13, 2022).

Confronted with a pitched battle regarding the true content of Graham crackers, my

learned colleague, Judge Bulsara, further explicated this standard as it applied in this context:

> "New York's General Business Law prohibits the use of deceptive acts or practices and false advertising in the conduct of any business, trade or commerce." *Axon*, – — F. App'x ——, 2020 WL 2787627, at *2 (quotations and brackets omitted) (citing N.Y. Gen. Bus. Law §§ 349 and 350). Specifically, Section 349 of the General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state," N.Y. Gen. Bus. Law § 349, and Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state," id. § 350. Both provisions are analyzed under the same framework: "To survive a motion to dismiss, plaintiffs must plausibly allege that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled by the relevant statements." *Axon*, —— F. App'x – ——, 2020 WL 2787627, at *2 (citing *Jessani v. Monini N. Am., Inc.*, 744 F. App'x

18, 19 (2d Cir. 2018)) (quotations omitted). "Furthermore, where the allegations of a complaint are materially inconsistent with the evidence a plaintiff relies on to make those allegations, [a court] may easily conclude that plaintiffs' claims lack the facial plausibility necessary to survive a motion to dismiss." *Id.* (citing *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013)) (quotations and brackets omitted); *see also Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941, 944 N.Y.S.2d 452, 967 N.E.2d 675 (2012).

"It is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement [or label] would not have misled a reasonable consumer." *Fink*, 714 F.3d at 741. The standard is an objective one: "Plaintiffs must plausibly allege that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Jessani*, 744 F. App'x at 19 (quotations omitted).

*Kennedy v. Mondelez Glob. LLC*, No. 19-CV-302 (ENV)(SJB), 2020 WL 4006197, at *9 (E.D.N.Y. July 10, 2020). Applying those requisites to the instant case, it appears that, at least in part, plaintiff satisfies this standard.

### Discussion

> *". . . but chocolate's gettin' old,*
> *Vanilla just leaves me cold*
> *There's just one flavor good enough for me."*
>
> -Weird Al Yankovic, "I Love Rocky Road"

Several courts have grappled with claims that consumers are defrauded when the ingredients of food products diverge from that which their name and flavor might otherwise suggest. In fact, defense counsel urges this Court to apply what it deliciously dubs the "SDNY Vanilla Cases' logic." DE 26-4 at 11. This moniker describes a basket of cases in our sister court[7] grappling with complaints by disaffected purchasers of vanilla products that were derived from substances other than vanilla bean. *See, e.g.*, *Twohig v. Shop-Rite Supermarkets, Inc.*, 519 F. Supp. 3d 154, 161 (S.D.N.Y. 2021) (vanilla-flavored soy milk) (citing *Wynn v. Topco Assocs.*,

---

[7] As can be derived from the citations in this decision, caselaw regarding flavor representations generally, or even vanilla more specifically, have not been limited to the SDNY, but include opinions from this Court and the Second Circuit Court of Appeals.

*LLC*, No. 19-CV-11104 (RA), 2021 WL 168541, at *3 (S.D.N.Y. Jan. 19, 2021) (vanilla-flavored almond milk)); *Barreto v. Westbrae Nat., Inc.*, 518 F. Supp. 3d 795 (S.D.N.Y. 2021) (soymilk); *Cosgrove v. Blue Diamond Growers*, No. 19-CV-8993 (VM), 2020 WL 7211218, at *3 (S.D.N.Y. Dec. 7, 2020) (almond milk); *Pichardo v. Only What You Need, Inc.*, No. 20-CV-493 (VEC), 2020 WL 6323775, at *5 (S.D.N.Y. Oct. 27, 2020) (protein drink); *Steele v. Wegmans Food Markets, Inc.*, 472 F. Supp. 3d 47, 50 (S.D.N.Y. 2020) (vanilla ice cream). Notably, all five cases resulted in dismissals.

In urging this Court to adopt the "Vanilla Cases' Logic," counsel for defendant suggests that these cases, taken as a whole, dictate a three-part test or, perhaps more accurately, identify three factors that, if present, warrant dismissal at the pleading stage. DE 26-4 at 12. This exegesis overstates the contours of the law, but these cases, along with others, do help identify certain elements worthy of consideration in applying the provisions of GBL § 349 and § 350 to consumer representations regarding flavor and ingredients.

Elements that can be culled from the cases in this area include the presence or absence of express representations regarding the ingredients used, such as "made with"; the availability of an ingredients list to the purchasing consumer; whether the flavor designation employed finds use as both a noun and an adjective; and the availability and significance of consumer survey evidence. *See Twohig*, 519 F. Supp. 3d at 165. This case introduces a fifth consideration that has not been broadly explored in the case law: allegations concerning competitor products giving rise to an inference about consumer expectations.

Thus, while not a formalized balancing test, these five elements—(1) the presence or absence of express representations, (2) context of the alleged misrepresentation, (3) etymological analysis, (4) allegations about competitor products and (5) consumer survey evidence—provide a

useful framework in analyzing the sufficiency of allegations concerning consumer expectations under GBL § 349 and § 350.  Review of these considerations follows:

### 1.  Express Representations

Clearly, if a plaintiff alleges that a product expressly—and falsely—purports to be "made with" or "contain" certain ingredients, such allegations will generally carry the day at the pleading stage.  For example, in *Sharpe v. A&W Concentrate Co.*, Judge Cogan denied a motion to dismiss a complaint against a root beer company whose labeling included the phrase "MADE WITH AGED VANILLA," when that statement was largely, if not entirely, untrue.  481 F. Supp. 3d 94, 103 (E.D.N.Y. 2020) (representation "falsely implies that any vanilla content derives predominantly from the vanilla plant, instead of its artificial and synthetic counterpart").  This decision relies on the Second Circuit's holding concerning Cheez-Its, finding a complaint sufficient where plaintiff alleged "the conspicuous 'WHOLE GRAIN' and 'MADE WITH WHOLE GRAIN' claims on the front and center of the Defendant's packaging communicates to the reasonable consumer the false message that the grain content of the crackers is exclusively, or at least predominately whole grain." *Mantikas v. Kellogg Co*., 910 F.3d 633, 638–39 (2d Cir. 2018) (reversing district court's dismissal of complaint).

Here, there is no allegation that defendant made any express representation about the origin of the pistachio flavor.  *Mantikas* and its progeny hold that an allegation of such an express representation, made falsely, is sufficient to survive a motion to dismiss.  However, that conclusion does not apply contrapositively; that is, the absence of such an allegation, despite defendant's protestations herein, does not necessarily require dismissal.  This element weighs in defendant's favor, requiring a closer look at the remaining factors.

2.   *Context of the Alleged Misrepresentation*

Evaluation of alleged consumer deception is context specific, and courts may consider aspects of labeling in determining whether consumers have been misled.  This context may include an ingredients list and the visual appearance of the product.

On this motion, defendant claims that the absence of "real" ingredients in its online ingredients list "is fatal" to plaintiff's GBL claims.  DE 26-4 at 15.  This represents a plain misstatement of the law.  In support of this assertion, counsel for defendant cite only a single case, which does not reach such a holding.  *Id.* (citing *Davis v. Hain Celestial Grp., Inc*, 297 F. Supp. 3d 327, 334 (E.D.N.Y. 2018)).  *Davis* cites a single district court decision from another circuit—*In re 100% Grated Parmesan Cheese Marketing and Sales Practices Litig*., 275 F. Supp. 3d 910, 922 (N.D. Ill. 2017)—which does so hold, but that decision was subsequently reversed by the Seventh Circuit.  *See Bell v. Publix Super Markets, Inc*., 982 F.3d 468, 476 (7th Cir. 2020) ("We therefore join our colleagues in at least three other circuits in holding that an accurate fine-print list of ingredients does not foreclose as a matter of law a claim that an ambiguous front label deceives reasonable consumers.").

Binding precedent in this Circuit makes similar provision.  In *Mantikas*, "the Second Circuit rejected arguments that information on the reverse side of the packaging, in the listing of ingredients, could clarify any potential misimpressions and thereby negate a claim of false advertising."  *Cosgrove v. Oregon Chai, Inc.*, 520 F. Supp. 3d 562, 577 (S.D.N.Y. 2021).  This analysis has been extended beyond cases of explicit misrepresentations—like those in *Mantikas*—to cases involving implicit misrepresentations.  *Cooper v. Anheuser-Busch, LLC*, 553 F. Supp. 3d 83, 107 (S.D.N.Y. 2021) ("[T]here is nothing in the decision to suggest that its analysis should be any less relevant here, where it is alleged that a product makes an *implicit*

10

ingredient claim.").

This concept leads to a second reason why defendant's suggestion that its online ingredients list dictates dismissal fails spectacularly. Courts have rejected defense arguments based on ingredients lists that are difficult for a consumer to access. *See, e.g.*, *id.* at 107 ("[C]ourts were hesitant to dismiss deceptive labeling claims on the basis of small-print or easy-to-miss disclosures . . . ."); *Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 8 F. Supp. 3d 467, 471 (S.D.N.Y. 2014) (denying motion to dismiss because "ingredients list on the back of the packaging is in small, hard to read print"). These typographic barriers pale in comparison to the physical segregation presented in this case: defendant is not attempting to rely on an ingredients list on the package or in small print on a sign, which might require a consumer to inspect a side panel or reach for a pair of reading glasses. Rather, examining defendant's ingredients list requires access to an Internet-capable device and conducting a web search to locate it. If "a reasonable consumer should not be expected to consult the Nutrition Facts panel on the side of the box to correct misleading information set forth in large bold type on the front of the box," *Mantikas*, 910 F.3d at 637, it seems inconceivable that such a consumer should have to search online to find the relevant web page while waiting in line to order a scoop of ice cream. Counsel has cited no authority, and this Court's research has disclosed none, suggesting that an online ingredients list can negate claims of misrepresentation.

Defendant's notion of requiring consumers to check an online ingredients list for clarification also seems antithetical to the experience offered by defendant to the public, as described on another section of its website:

> But we're about more than just serving up amazing ice cream. We like to think we're really in the business of making people happy . . .
>
> It's all about what we call the 10-Minute Vacation® . . . that 10-minute getaway

> you deserve from the world outside our doors. Just head inside any Cold Stone
> Creamery, and that's what you'll get. From our enthusiastic, singing crew members,
> to the shared laughter of a family enjoying a treat together — if it's making you,
> your friends, or your loved ones happy, then we're doing our jobs right![8]

So the thought is that in the midst of a trademarked "10-Minute Vacation," customers have a duty to locate, read and analyze its electronic "Ingredient Statement"[9]—replete with references to Guar Gum, Diglycerides, Polysorbate 80, and Propylene Glycol—to fully protect their legal interests.  Before advancing this argument, counsel may be well advised to research the term "buzzkill."

Moreover, counsel for defendant argues that the visual appearance of the ice cream—which it argues is smooth and without apparent chunks of pistachio—is unavailing.  As there are no allegations relating to the appearance of the product, that matter is not before the Court at this juncture.

   3.  *Linguistic Factors*

Some cases considering whether a particular descriptor proves misleading have turned to etymological analysis.  Whether the subject term is used solely as a noun, or finds application as an adjective, can help determine its significance to consumers; for example, "the word 'vanilla' can be used as both a noun and an adjective, and can be commonly understood to denote a flavor, in addition to the vanilla bean or an extract from the bean."  *Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 582 (S.D.N.Y. 2021) (citing Merriam-Webster's Online Dictionary and the Oxford English Dictionary Online); *see also Mitchell v. Whole Foods Mkt. Grp., Inc.*, No. 20-CV-8496 (ER), 2022 WL 657044, at *5 (S.D.N.Y. Mar. 4, 2022) ("Like vanilla, chocolate can be

---

[8] Available at https://www.coldstonecreamery.com/aboutus/index.html.  While this portion of defendants' website is not cited in the papers, defendant's website description seems fully consistent with the common understanding of frequenting ice cream specialty shops.
[9] Available at https://www.coldstonecreamery.com/nutrition/index.html.

used as both a noun and an adjective, and can be commonly understood to denote a flavor.").
The fact that "vanilla" modifies "bean" makes this fairly clear; that the public has become
familiar with the use of vanilla-scented candles and shampoos further drives the point home.

According to the *Oxford English Dictionary*, pistachio functions as a noun principally to
describe the "fruit of the tree *Pistacia vera*, a nutlike drupe with a thin shell; (also) its edible pale
greenish seed, which is frequently roasted and salted."[10]  Interestingly, the *OED* also offers up an
adjectival form.[11]  However, that adjective applies not to a flavor, but to a color, to wit: "Of or
having the green colour of the kernel of the pistachio nut."[12]

Thus, the noun-adjective distinction would appear to weigh in defendant's favor.  Of
course, the moment one employs a term to describe an ice cream the noun-adjective distinction
blurs: when one orders a "Moose Tracks" ice cream cone, the hoofprints of the largest member
of the deer family linguistically acts as an adjective.  Thus, while "pistachio" does not hold the
same generic flavor sense as chocolate and vanilla, when it is paired with "ice cream" or
"pudding," it might well serve as a flavor name.  To make that determination, though, we need to
turn to the remaining factors.

Yet before leaving etymology behind, however, it is worth considering the uses of
"mint."  First and foremost, the *OED* advises that "mint" encompasses "[a]ny of various
aromatic plants constituting the genus *Mentha*, which includes many kinds grown as culinary
herbs; *esp.* a cultivated plant of this genus, *spec.* spearmint."[13]  Thus, in terms of describing a
plant-based ingredient, the term is highly unspecific.  At the same time, the *OED* reminds us that

---

[10] *Pistachio*, Oxford English Dictionary (3d ed. last modified 2023),
https://www.oed.com/dictionary/pistachio_n?tab=meaning_and_use#29815778.
[11] *Id.*
[12] *Id.*
[13] *Mint*, Oxford English Dictionary (3d ed. last modified 2024),
https://www.oed.com/dictionary/mint_n2?tab=meaning_and_use#37024302.

"mint" expressly refers to "[a] sweet or chocolate containing or flavoured with (an extract of) mint,"[14] as anyone who has ever purchased a package of mints can attest.  Thus, mint presents two problems for plaintiff: as an ingredient descriptor, it is highly unspecific, whereas it commonly finds use as a flavor descriptor without any reasonable expectation that the leaves of a particular mint plant will be involved.

### 4. Comparison to Competitive Products

As noted, the complaint specifically identifies three common ice cream brands— including a discount supermarket product—that feature pistachios as an ingredient in their pistachio ice creams.  At this juncture, at which the Court must draw inferences in favor of plaintiff, such evidence weighs in favor of plaintiff in terms of consumer expectations.  Several cases have examined the effect of alleging competitor data in terms of pricing, *see, e.g.*, *Goldemberg*, 8 F. Supp. 3d at 482 ("identifying the prices of competing products in the Complaint would strengthen Plaintiff's allegation of injury"), and allegations of the use of certain ingredients by competitors can provide insight into customary practice and, by extension, consumer expectations.  *See Scott v. Saraya USA, Inc.*, 675 F. Supp. 3d 1040, 1047 (N.D. Cal. 2023) ("[Plaintiff's] arguments about competitor products that are 'advertised similarly and are actually solely sweetened with monk fruit' . . . plausibly support that ['consumers] . . . could be misled.'").  Notably, plaintiff offers no such allegations as to any of the accused products other than pistachio, undermining her claims as to those products.

### 5. Consumer Survey Evidence

The most significant addition to the amended complaint is the inclusion of survey evidence.  As noted above, 85% of the respondents expected that pistachios would be included

---

[14] *Id.*

among the ingredients in the defendant's pistachio ice cream.  Defendant attempts to quarrel with the survey methodology, an effort which proves both unpersuasive and misplaced at this juncture, as the open-ended questioning here stands in stark contrast to leading questions asked in other cases.  *See Procter & Gamble Co. v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 352 (S.D.N.Y. 2008) ("A survey is not credible if it relies on leading questions which are inherently suggestive and invite guessing by those who did not get any clear message at all.") (citations omitted).  And although defendant relies on the rejection of survey evidence by several other courts, the results of those surveys were far less compelling.  *Twohig v. Shop-Rite Supermarkets, Inc.*, 519 F. Supp. 3d 154, 159 (S.D.N.Y. 2021) (plaintiff's survey alleged 43% of consumers expected vanilla to originate from vanilla bean or the vanilla plant); *Parham v. Aldi, Inc.*, No. 19 CIV. 8975 (PGG), 2021 WL 4296432, at *6 (S.D.N.Y. Sept. 21, 2021) (same)

As to the survey evidence regarding defendant's "Mint" ice cream, these results are, largely for the linguistic considerations discussed above, difficult to interpret.  While 88% of the respondents indicated that they expected to find "mint" among the included ingredients, it is impossible to say what this means.  Did they believe that the ice cream contained mint leaves or the extract of a mint plant?  As "mint" encompasses an entire family of plants as well as common candies that bear the flavor of mint, this result proves far less compelling.  Perhaps, after all, some respondents expected to find "chunks of red and green mint candy," the advertised feature of Hershey's Premium Peppermint Stick ice cream, seen here.[15]



*Hershey's Ice Cream with Chunks of Mint Candy*

In sum, when considering the allegations relating to

---

[15] https://www.hersheyicecream.com/peppermint-stick-premium/

defendant's Pistachio ice cream, including the information about competitors' products and the survey results, plaintiff has alleged claims of deceptive practices under the GBL which are plausible on their face.  The remaining flavors, however, do not satisfy the *Twombly-Iqbal* standard, even assuming plaintiff has standing (a dubious proposition given that she did not purchase any of them).  Plaintiff failed to allege any information about competitor products, and the only other survey results offered relate to the defendant's Mint ice cream, which proves unconvincing for the reasons discussed.  Thus, defendant's motion to dismiss the GBL claims will be denied as to defendant's Pistachio Ice Cream, but granted as to the other flavors.

### *Remaining Claims*

#### *Express Warranty*

In the Amended Complaint, plaintiff bases her express warranty claim solely on the following allegation: "Defendant explicitly named the Products after specific ingredients (e.g., "Pistachio"), unambiguously representing to consumers that the Products contain those ingredients."  DE 21 ¶ 58.  In its motion papers, defendant argues that the use of "Pistachio" in this context constitutes a "[g]eneralized statements by Cold Stone [that cannot] support an express warranty claim [because] a reasonable consumer would not interpret the statement as a factual claim upon which he or she could rely."  DE 26-4 at 21 (citing *Silva v. Smucker Nat. Foods, Inc.*, No. 14-CV-6154 JG RML, 2015 WL 5360022, at *10 (E.D.N.Y. Sept. 14, 2015)).  Remarkably, defendant relies upon *Silva* even though that case holds that "a reasonable consumer's interpretation of a seller's representation might be is generally an issue of fact that is not appropriate for decision on a motion to dismiss."  *See id.*  Equally remarkably, in resisting dismissal of the express warranty claim, plaintiff relies almost exclusively on *Ackerman v. Coca-Cola Co.*, No. CV-09-0395 (JG), 2010 WL 2925955, at *24 (E.D.N.Y. July 21, 2010), which

found that "plaintiffs have failed to plead a claim for violation of an express warranty." Nevertheless, for the reasons set forth above and under the reasoning of *Silva*, the Court declines to dismiss the express warranty claim at this time with respect to the Pistachio Ice Cream product, but dismisses the claim as to all other products for the reasons explained above.

*Implied Warranty*

Defendant requests dismissal of the implied warranty claims, contending that their Pistachio ice cream was "fit for the ordinary purposes for which such goods are used; and . . . conform to the promises or affirmations of fact made on the container or label if any."  N.Y. U.C.C. § 2-314(2).  However, "[a] warranty of merchantability . . . does not mean that the product will fulfill a buyer's every expectation but rather simply provides for a minimum level of quality."  *Ackerman*, 2010 WL 2925955, at *25 (quoting *Viscusi v. Proctor & Gamble*, No. 05 Civ. 1528 (DLI) (LB), 2007 WL 2071546, at *13 (E.D.N.Y. July 16, 2007)).  "Where the sale of a food or beverage is concerned, courts have ruled that the product need only be fit for human consumption to be of merchantable quality."  *Cosgrove*, 520 F. Supp. 3d at 586; *see also Silva*, 2015 WL 5360022, at *11.  Based on these authorities, the claim for implied warranty is dismissed.

*Unjust Enrichment*

The New York Court of Appeals has long adhered to the principle that an unjust enrichment claim cannot serve as a "catchall" when another cause of action is clearly applicable, which it has applied in the context of GBL claims:

> An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim (*Clark–Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 388–389, 521 N.Y.S.2d 653, 516 N.E.2d 190 [1987]; *Samiento v. World Yacht Inc.*, 10 N.Y.3d 70, 81, 883 N.E.2d 990 [2008]; *Town of Wallkill v. Rosenstein*, 40 A.D.3d 972, 974, 837 N.Y.S.2d 212 [2d Dept.2007]).

Here, plaintiffs allege that Verizon committed actionable wrongs, by trespassing on or taking their property, and by deceiving them into thinking they were not entitled to compensation.  To the extent that these claims succeed, the unjust enrichment claim is duplicative; if plaintiffs' other claims are defective, an unjust enrichment claim cannot remedy the defects.  The unjust enrichment claim should be dismissed.

*Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790–91, 967 N.E.2d 1177, 1185 (N.Y. 2012) (finding that since GBL § 349 claim was dismissed as time-barred, plaintiff could not assert an unjust enrichment claim in the alternative); *see also MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 100 (2d Cir. 2023) (noting that an argument that "the unjust enrichment claim is duplicative of the General Business Law claims—may well be meritorious").  Therefore, plaintiff's unjust enrich claim is dismissed.

### *Conclusion*

For the reasons set forth above, defendant's motion to dismiss is:

- DENIED with respect to GBL claims regarding defendant's Pistachio Ice Cream, but GRANTED as to all other accused products;

- DENIED as to plaintiff's express warranty claim regarding defendant's Pistachio Ice Cream, but GRANTED as to all other accused products; and

- GRANTED as to plaintiff's implied warranty and unjust enrichment claims.

SO ORDERED:

Dated: Central Islip, New York
        May 2, 2024


                                         /s/ Gary R. Brown
                                         HONORABLE GARY R. BROWN
                                         UNITED STATES DISTRICT JUDGE

18